IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| LAWRENCE S.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00034 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:   Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Lawrence S. asks this Court to review the Commissioner of Social Security's

final decision denying his application for disability insurance benefits ("DIB") under Title II of

the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. This case is before me by referral

under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs,

and the applicable law, I find that the Commissioner's final decision is supported by substantial

evidence. Accordingly, I respectfully recommend the presiding District Judge affirm the

decision.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See*

2

*Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[2] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In August 2013, Lawrence filed for DIB alleging that he was disabled by fibromyalgia; rotator cuff syndrome; lumbar myofascial, spondylosis, herniation, and annular tear; traumatic brain injury and post-concussion syndrome; diabetes; heart disease; hypertension; sleep apnea; bipolar disorder; and attention deficit disorder. *See* Administrative Record ("R.") 176–77, 188, ECF No. 14-1. Disability Determination Services ("DDS"), the state agency, denied his claim initially in March 2014, R. 74–85, and upon reconsideration that December, R. 86–101. On June 7, 2016, Lawrence appeared with counsel and testified at an administrative hearing before ALJ William Hauser. *See* R. 45–72. A vocational expert ("VE") also testified at this hearing. R. 66–72. ALJ Hauser issued an unfavorable decision on August 3, 2016. R. 24–36. The Appeals Council declined to review that decision, R. 1–5, and Lawrence sought review from this Court on September 29, 2017, *see Lawrence S. v. Berryhill*, Case No. 5:17cv96, 2019 WL 1441630 (W.D. Va. Mar. 31, 2019) ("*Lawrence I*").

On March 31, 2019, I issued an order reversing the Commissioner's denial of benefits and remanding the case to the Social Security Administration under the fourth sentence of 42 U.S.C. § 405(g). R. 2139. The Appeals Council then sent Lawrence's case to another ALJ, R. 2118–20, and on December 23, 2019, he appeared with counsel and testified at an administrative

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

hearing before ALJ Scott Massengill, R. 2074–2115. A vocational expert also testified at this hearing. R. 2107–11.

ALJ Massengill issued an unfavorable decision on March 24, 2020. *See* R. 2030–46. He first found that Lawrence had not worked since he allegedly became disabled on September 23, 2011, and that he met the Act's insured-status requirements through December 31, 2013.[3] R. 2032. At step two, ALJ Massengill found that during this relevant period Lawrence suffered from the following "severe" impairments: degenerative disc disease ("DDD") of the lumbar and cervical spine; degenerative joint disease post status rotator cuff repair; tumor of the lumbar spine; brain injury; post-concussion syndrome; coronary artery disease; and obesity. *Id.* His other impairments were non-severe. R. 2032–33. None of Lawrence's "severe" impairments, considered alone or in combination, met or medically equaled a relevant Listing. R. 2034–36 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 4.04, 11.18, 12.04, 12.06).

ALJ Massengill then evaluated Lawrence's residual functional capacity ("RFC") and found that during the relevant period he could have performed "light work"[4] with additional limitations. R. 2036. Lawrence could "frequently climb ramps and stairs, occasionally balance, stoop, kneel, crouch, crawl and climb ladders, ropes and scaffolds, [was] limited to frequent use of either upper extremity for overhead reaching, must avoid concentrated exposure to extreme cold, wet or [d]amp conditions, [and] must avoid work at unprotected heights." R. 2036–37.

---

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for DIB, Lawrence had to "prove that [he] became disabled prior to the expiration of [his] insured status." *Johnson*, 434 F.3d at 656.

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

Lawrence also was "able to understand and remember simple, routine instructions and carry out repetitive tasks, make simple, work related decisions and [was] able to deal with minor, or few, changes in a routine work setting." R. 2037. He could not "work on an assembly line or perform work involving a strict production rate pace," and he would "be off task 10% of the work day and [would] be absent 10 days a year." R. 2037. Based on this RFC finding and the VE's testimony, ALJ Massengill determined that Lawrence was unable to perform his past relevant work as a general contractor. R. 2044. Nevertheless, because "there were [other] jobs that existed in significant numbers in the national economy that [Lawrence] could have performed," such as final inspector, final assembler, and racker, ALJ Massengill concluded at step five that he was not disabled between September 23, 2011, and December 31, 2013. R. 2045. The Appeals Council did not exercise its discretion to review ALJ Massengill's decision, thus making it the final decision of the Commissioner denying Lawrence's DIB claim. *See Alicia W. v. Saul*, No. 5:20cv6, 2021 WL 2366108, at *2 (W.D. Va. June 9, 2021) ("'If no exceptions are filed and the Appeals Council does not assume jurisdiction' on its own within the sixty-day period, the ALJ's hearing decision automatically 'becomes the final decision of the Commissioner after remand.'"). This appeal followed.

### III. Discussion

Lawrence challenges ALJ Massengill's RFC determination. *See generally* Pl.'s Br. 14–18, ECF No. 18. Specifically, Lawrence contends that the ALJ erred by failing to properly evaluate his subjective complaints of shoulder pain in accordance with the regulations and this Court's remand order. *Id.* at 14–16 (citing R. 2137–38). He asserts that ALJ Massengill "failed to craft [] a logical bridge from the evidence of record to his conclusion," *id.* at 15, that he provided a flawed explanation of his analysis of the objective medical evidence, *id.* at 16, and that he

mischaracterized the nature of such evidence, *id.* at 16–17. Lawrence also argues that the ALJ failed to properly consider his activities of daily living by not accounting for the limited manner in which he performed such activities. *Id.* at 17. Lastly, he contends that the ALJ's finding that he could perform "light" work contradicts Lawrence's testimony that he could not stand for more than fifteen minutes.

A.    *Summary*

   1.    *Relevant Medical Evidence[5]*

   On May 15, 2012, Lawrence visited Neil Chatterjee, M.D., at the Virginia Spine Institute. R. 328–31. Lawrence reported chronic whole-body pain for more than ten years that he attributed to a motorcycle accident, power lifting, construction work, and fighting. *See* R. 328. He said he took up to five Percocet tablets a day, but received no relief and was unable to return to regular activities. On exam, Dr. Chatterjee found that Lawrence had a normal gait, appropriate mood and affect, spine tenderness, normal straight leg raising tests, intact strength and sensation in his extremities, right upper extremity tremor, and positive signs for carpal tunnel syndrome ("CTS"). Dr. Chatterjee deemed it necessary to get more information to assess Lawrence's chronic pain, but in the meantime he prescribed up to six doses of Dilaudid a day. At a follow-up visit on June 5, Lawrence reported no pain relief from the medication. R. 332–33. He was still lifting heavy weights, though. Exam findings were the same, and Dr. Chatterjee substituted Roxicodone for Dilaudid. *See id.*

   On July 17, Lawrence saw Brian R. Subach, M.D., at the Virginia Spine Institute, also for chronic pain. R. 340–41. Dr. Subach's exam findings were normal. He also reviewed a cervical

---

[5] The summary of the medical evidence relating to Lawrence's physical impairments is substantially taken from my prior memorandum opinion. *See generally Lawrence I*, 2019 WL 1441630, at *3–4. No new medical evidence has been submitted since that decision.

MRI that showed mild abnormalities. He noted some spinal cord signal changes, possible signs of myelopathy, and an old MRI showing decreased disc height at L5-S1. He determined that surgery was not warranted, and he ordered a lumbar spine MRI to assess the underlying pathology. The MRI showed 75% disc height loss and significant narrowing at L5-S1. R. 339.

On September 21, Dr. Chatterjee performed an electroneuromyographic (EMG") evaluation, which showed no lower extremity radiculopathy or peripheral neuropathy. R. 350–54. A physical examination of Lawrence's lower extremities was normal. A month later, Lawrence told Dr. Chatterjee that he was still competing in power lifting. R. 346–48. Exam findings were normal, but Lawrence reported that medications did not control his pain. Dr. Chatterjee prescribed Oxycontin as well as Roxicodone.

An MRI taken on August 31, 2012, of Lawrence's right shoulder revealed mild tendinopathy and labral tear, but no rotator cuff tear. R. 439–40. On September 11, Lawrence visited Frank A. Pettrone, M.D., who had operated on his left shoulder in 2010. R. 436. Lawrence said he had been able to return to power lifting after that surgery, but he had recently strained his shoulder. On examination, Dr. Pettrone found some impingement, but good stability and motion. He injected Lawrence's shoulder with Xylocaine and discussed decompression surgery. On November 1, Lawrence had right shoulder and CTS release surgery. R. 454. At post-operation examinations in November, Dr. Pettrone noted that Lawrence was progressing well, and he released him to full activities and shoulder rehabilitation therapy. *See* R. 430–32. On January 2, 2013, Dr. Pettrone found good shoulder motion, stability, and strength, but noted that Lawrence had other problems caused by fibromyalgia and leg and back pain for which he was prescribed fentanyl patches and Oxycontin. R. 429. On March 21, Lawrence told Dr. Pettrone that two months earlier he had twisted and strained his shoulder while trying to restrain his

daughter from fighting his wife. R. 428. As a result, he had been in pain and had difficulty lifting

and reaching. On examination, he had good strength and motion, but impingement pain. Dr.

Pettrone ordered an MRI, which showed moderate subacromial/subdeltoid bursitis, mild to

moderate osteoarthritis of the acromioclavicular joint, and "[r]otator cuff tendinopathy with high-

grade/full-thickness perforations." R. 389; *see also* R. 427. On July 18, 2013, Lawrence again

had good strength and motion, but positive impingement. R. 427. Lawrence said he could not lift

or use his arm, but he wanted to be able to return to power lifting. Dr. Pettrone expressed

concern over Lawrence's use of 120mg of Oxycontin a day and explained that he would not

operate on Lawrence's shoulder again until he stopped taking such a high amount of Oxycontin.

Lawrence made regular visits every two to three months to Winchester Family Health,

including throughout the relevant period of September 2011 to December 2013. *See generally* R.

684–745. At most visits, he told Hugh LaBree, FNP, that he had pain in his joints, legs, and

back, but LaBree's findings on physical and mental examination were mostly normal. *See, e.g.*,

R. 692–93, 698, 703, 710–11, 733, 737.

In 2012 through 2013, Lawrence also visited the National Spine & Pain Center about

once a month, and he was primarily treated by Maria Paz S. Babcock, D.O. He had been referred

there for treatment for fibromyalgia and generalized pain. On October 4, 2012, Lawrence

complained of chronic pain aggravated by sitting, standing, walking, and lying flat. R. 830. He

had tried pain medications, physical therapy, injections, and chiropractic treatment, but they did

not alleviate his pain. Physical and mental examination findings were normal, except that he had

diffuse tenderness in the upper and lower extremities as well as the cervical and lumbar regions.

R. 832. The examining doctor noted, "[t]rue weakness difficult to assess due to pain and

tenderness on examination, and patient's overall feeling of weakness." *Id.* (punctuation

corrected). Over the course of Lawrence's treatment at the National Spine & Pain Center, Dr. Babcock at times found no abnormalities on physical and mental examination. *See* R. 796–99, 807–10, 824–26, 827–29. On other visits, she noted abnormal findings on lumbar spine examinations, including positive straight leg raising tests. R. 782–86, 787–91, 792–95, 800–03, 815–19. Dr. Babcock prescribed Oxycodone and at times Fentanyl patches and Dilaudid, and she administered Lidocaine injections.

The DDS physician who reviewed Lawrence's medical records in March 2014 opined that, notwithstanding his "severe" lumbar DDD and dysfunction of a major joint, R. 79–80, 82, Lawrence could lift, carry, push and/or pull 50 pounds occasionally and 25 pound frequently, stand and/or walk for about six hours and sit for about six hours during an eight-work day, and had no postural, manipulative, or environmental limitations, R. 81–82. *See* R. 79, 84 (proposing "medium" exertional RFC). The physician explained that, while Lawrence's record showed "a history of back pain associated with [lumbar] DDD and complaints of all-over pain," findings on physical exams were "essentially normal," R. 79, including "[n]ormal gait and strength," R. 82. Such findings required "no more than mild-to-moderate restrictions" on his physical work-related capacities during the relevant time, R. 81. In December 2014, a second DDS physician agreed that Lawrence could do "medium" exertion work, *see* R. 96, 98, but opined that he also would have been limited to "frequently" climbing ramps/stairs, balancing, stooping, kneeling, and "occasionally" crouching, crawling, and climbing ladders, ropes, and scaffolds, R 97. He would not have had any manipulative or environmental limitations. R. 97.

2.    *Lawrence's Statements*

In written statements submitted to the state agency, Lawrence described his typical activities. R. 213–14, 225–32 (Jan. 29, 2014). When he was doing well, Lawrence helped his

wife clean the house, cook meals, and take care of their adult daughter, who had special needs. R. 225–26. He cooked simple meals weekly or daily for fifteen minutes to two hours, but standing caused significant pain, taking hours or days to recover, and he cooked less frequently than in the past. *See* R. 227. He sometimes fell asleep while driving or trying to do other activities. R. 213; *see also* R. 705 ("Pt. reports increased fatigue to the point that he has a hard time staying awake while driving." (Apr. 4, 2013)). Depending on how he felt, he could watch television and "build[] & design[] things." R. 229. Lawrence shopped in stores for food once a week for thirty to sixty minutes. He had been a competitive power lifter, but he had stopped after he reinjured his shoulder in late 2012. *See* R. 63–65, 229–30. Lawrence had been dealing with severe pain for many years, "pushing through it," R. 213, 232 (grammar corrected), but by 2011 or 2012 the pain significantly limited his activities and affected his concentration on many, but not all, days.

In December 2019, Lawrence testified at an administrative hearing before ALJ Massengill. *See* R. 2073–2115. He previously worked in construction, but he could not work after 2011 because of problems with his "brain and [his] body." R. 2087. He testified that he could drive "[a]t times" during the relevant period, but his vertigo would often make him feel intoxicated. R. 2088. He could manage his finances when he was doing well, but his wife typically handled them. R. 2091. He testified that during the relevant period, his impairments would cause his back to "just go out" during even routine tasks. R. 2092. It had been "a long time" since he had been able to lie down, sit, or stand for long periods. R. 2093. Lawrence said he "recovered quite quickly" and "still competed in powerlifting" after tearing three muscles and three ligaments in his shoulder, but during the relevant period, his shoulder pain caused difficulty reaching. R. 2094–95. Lawrence usually could not stand more than fifteen to twenty minutes, but

if he "ke[pt] moving and [got] in different positions," he "usually [could] keep on going through

most of the day." R. 2097. He could lift "about as much as two or three men" when he was doing

well, but other times he would "just about have to have somebody carry [him]." R. 2097. He

often would need to lie down for about twenty minutes during an eight-hour period, and he was

able to cook and do a "little bit of cleaning." R. 2103. When asked if he was able to maintain his

personal needs, he said "there were probably a couple of months where [he] couldn't do much."

R. 2105.

B.      *The ALJ's Decision*

ALJ Massengill discussed this evidence throughout his decision. *See generally* R. 2034–

44. In determining Lawrence's RFC, ALJ Massengill summarized Lawrence's subjective

statements regarding his symptoms,[6] R. 2037, summarized the medical evidence, R. 2038–40,

and evaluated the medical opinion evidence of record, R. 2042–43. He found that Lawrence's

"medically determinable impairments could reasonably be expected to cause the alleged

symptoms," but that his "statements concerning the intensity, persistence and limiting effects of

these symptoms [were] not entirely consistent with the medical evidence and other evidence in

the record for the reasons explained [elsewhere] in [his] decision." R. 2040.

In determining that Lawrence's shoulder pain was not as severe as alleged, ALJ

Massengill noted that Lawrence "reported severe pain and limitations involving his shoulders,"

and that he underwent surgery on his left shoulder before his alleged onset date. R. 2041.

Nevertheless, Lawrence also "reported significant relief following his surgery, including being

able to resume power lifting," and "while Lawrence testified that "his left should[er] continued

to produce symptoms, the evidence did not show imaging or significant exam findings during the

---

[6] "Symptoms" are the claimant's own description of his or her medical condition. 20 C.F.R. §
404.1502(i).

relevant period to support his complaints." *Id.* And, although "[t]here were some remarkable

findings, such as tenderness and positive impingement signs," after Lawrence's right shoulder

surgery, "there were also many unremarkable findings," including "normal extremities with no

tenderness, intact sensation, full strength and full range of motion." *Id.* "Additionally, post

surgical imaging of his right shoulder showed only mild to moderate findings." *Id.*

The ALJ also found that Lawrence's "reported activities and abilities [were] not fully

consistent with a finding of disability." *Id.* In support of this finding, he first noted that Lawrence

reported he was "able to tend to his personal care and hygiene, clean his home, run errands, care

for his disabled child, prepare meals and shop in stores," that he could "maintain his finances and

handle his prescriptions, medical appointments and insurance," and that he "reported he is able to

get around by walking and driving his car[], as well as attend church and family gathering[s]."

*Id.* Further, ALJ Massengill noted that Lawrence "reported lifting heavy weights and competing

in power lifting competitions prior to his shoulder surgery." *Id.* ALJ Massengill explained that

"[s]ome of the physical and mental abilities and social interactions required in order to perform

these activities are the same as those necessary for obtaining and maintaining employment." *Id.*

Based on this, he concluded that Lawrence's "ability to participate in such activities diminishe[d]

the persuasiveness" of Lawrence's alleged functional limitations. *Id.*

Nonetheless, ALJ Massengill determined that Lawrence's severe impairments and related

symptoms, including shoulder "pain, weakness and difficulty with reaching and lifting" caused

"significant limitations" that precluded work at the "medium exertional level" and required

restricting Lawrence to at most "frequent" overhead reaching and "occasional" to "frequent"

postural activities, as well as limiting his exposure to certain workplace conditions. Thus, ALJ

Massengill discounted the DDS physicians' medical opinions and limited Lawrence to a reduced range of "light" work. *See* R. 2041–42.

C.      *Analysis*

Lawrence argues ALJ Massengill's RFC determination is not supported by substantial evidence because he failed to properly evaluate Lawrence's subjective statements regarding his symptoms. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's

13

symptoms to determine the extent to which they limit his ability," *Lewis*, 858 F.3d at 866, to

work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015);

*Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The

second determination requires the ALJ to assess the credibility of [subjective] statements about

symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant

evidence in the record, 20 C.F.R. § 404.1529(c).

The ALJ must give specific reasons, supported by "references to the evidence," for the

weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL

5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July

2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or

laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about

the intensity, persistence, and limiting effects of symptoms solely because the objective medical

evidence does not substantiate' them." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th

Cir. 2020) (quoting SSR 16-3p, 2016 WL 1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A

reviewing court will uphold the ALJ's credibility determination if his articulated rationale is

legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of

Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011

(4th Cir. 1997)).

Under this deferential standard, I find that ALJ Massengill's RFC determination is

supported by substantial evidence. First, Lawrence asserts that the ALJ misstated the evidence in

concluding that "there were many unremarkable findings of [Lawrence's] shoulder following his

surgery including findings of 'no tenderness, intact sensation, full strength and full range of

motion.'" Pl.'s Br. 16 (quoting R. 2041). According to Lawrence, "the citations the ALJ listed in

14

support of this assertion do not show what he claimed," and although the ALJ cited to

Lawrence's March and July 2013 surgical follow-ups for this proposition, he "ignored that these

notes actually showed positive impingement signs and pain." *Id.* Lawrence also asserts that

"[e]very other citation the ALJ listed did not contain a specific shoulder examination," and that

the ALJ erroneously "classified [Lawrence's] postsurgical imaging as showing only 'mild to

moderate findings,'" when it demonstrated "[r]otator cuff tendinopathy with *high-grade/full-*

*thickness* perforations." *Id.* (quoting R. 389).

      Lawrence's arguments overlook other parts of the ALJ's decision, which the Court must

consider as a whole. *See Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) ("We must

read the ALJ's decision as a whole."). The ALJ specifically discussed the positive impingement

signs and pain demonstrated during Lawrence's 2013 post-surgical exams. *See* R. 2041

("Following his surgery on his right shoulder, [Lawrence] reported severe pain and weakness.

There were some remarkable findings, such as tenderness and positive impingement signs."); *see*

*also* R. 2039 ("During exams in April and July of 2013, [Lawrence's] right shoulder had a

positive impingement sign, but he had full range of motion and intact muscle strength."). In

reviewing the medical evidence, the ALJ also discussed Lawrence's right shoulder MRI results:

"In March 2013, [Lawrence] underwent an MRI of his right shoulder. The imaging revealed

moderate bursitis, mild to moderate AC joint osteoarthritis and rotator cuff tendinopathy with

perforation and low grade tearing." R. 2039. In his RFC analysis, the ALJ did not again note that

Lawrence's post-surgical imaging showed "[r]otator cuff tendinopathy with high grade/full-

thickness perforations," but he did accurately note the "mild to moderate" findings of bursitis

and osteoarthritis. R. 389. The ALJ met the requirement to review the medical evidence relevant

to Lawrence's shoulder impairment and explain how that evidence informed his RFC

determination. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005))).

ALJ Massengill considered this evidence. He then balanced it with the "unremarkable findings" from Lawrence's post-surgical exams, including that Lawrence "often had normal extremities, with no tenderness, intact sensation, full strength and full range of motion." R. 2041. The treatment notes that the ALJ cited primarily addressed Lawrence's spine impairment, but they also noted assessment of "rotator cuff syndrome." R. 784 (August 2013), 798 (July 2013). Musculoskeletal examinations were performed at those visits, which presumably would have revealed any functional deficits Lawrence experienced from his shoulder impairments. The ALJ could reasonably assess these examination findings as mostly unremarkable. *See, e.g.*, R. 789 (October 2013 physical exam showing "normal full range of motion in all joints" and "normal reflexes, coordination, muscle strength and tone"); R. 793 (August 2013 exam with same findings); R. 798 (July 2013 exam with same findings). Moreover, ALJ Massengill reduced Lawrence's RFC to account for his shoulder pain and difficulty reaching and lifting, including by limiting him to "light" work with only "frequent use of either upper extremity for overhead reaching." R. 2036. As such, ALJ Massengill reasonably balanced the evidence and determined that although Lawrence's impairments imposed some functional limitations, he did not suffer from greater or disabling limitations.

Lawrence also argues that ALJ Massengill erred in his analysis of Lawrence's daily activities because "just as in the original decision," he failed to account for the limited manner in which Lawrence was able to perform these activities. Pl.'s Br. 17. An ALJ may properly consider a claimant's daily activities as one relevant factor in evaluating his subjective

complaints regarding his symptoms. 20 C.F.R. § 404.1529(c)(3)(i); *see also Arakas*, 983 F.3d at 101 ("A claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with [his] ability to carry out daily activities."). The Fourth Circuit has observed that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as [he] would be by an employer." *Id.* (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). As such, "[a]n ALJ cannot consider the *type* of activities a claimant can perform without also considering the *extent* to which [he] can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018).

In remanding ALJ Hauser's prior decision, this Court held that ALJ Hauser had improperly evaluated Lawrence's daily activities because although he accurately identified that Lawrence "was lifting heavy weights during the [relevant] period," he did not appear to have considered evidence that undermined his conclusion. *Lawrence I*, 2019 WL 1441630, at *6 (quoting R. 33). Lawrence asserts that ALJ Massengill's decision suffers from the same fatal flaw. Pl.'s Br. 17. ALJ Massengill's discussion of Lawrence's daily activities, however, offers a far more thorough analysis than the prior decision, and it allows the Court to understand why ALJ Massengill reasonably found that Lawrence's "ability to participate in such activities diminishe[d] the persuasiveness" of his allegedly disabling functional limitations. R. 2041.

Previously, this Court took issue with ALJ Hauser citing only Lawrence's weightlifting as demonstrating that his daily activities supported a finding of greater functional abilities, but neglecting to mention that Lawrence subsequently told providers that his shoulder again became symptomatic or to account for his statements that he was unable to lift weights in late 2012 or early 2013. *Lawrence I*, 2019 WL 1441630, at *9. Although ALJ Massengill also cites

17

Lawrence's "lifting heavy weights and competing in power lifting competitions prior to his shoulder surgery," in support of his determination that Lawrence's daily activities suggest a lesser degree of limitation than alleged, that is a proper consideration, given that Lawrence said he engaged in competitive weightlifting during the relevant period that he also claimed to be disabled. *Cf. Bodnarchuk v. Barnhart*, 70 F. App'x 411, 412 (9th Cir. 2003) (ALJ properly rejected physician's opinion that claimant had been "disabled" since 1981, in part because the opinion conflicted with evidence of "strenuous activities in which Bodnarchuk engaged after 1981, including camping, horseback riding, weightlifting, and low-impact aerobics"). Moreover, ALJ Massengill's analysis did not stop with Lawrence's weightlifting. R. 2041. He also discussed Lawrence's ability to "tend to his personal care and hygiene, clean his home, run errands, care for his disabled [adult] child, prepare meals and shop in stores," his testimony that he was "able to maintain his finances and handle his prescriptions, medical appointments and insurance," and that he was "able to get around by walking and driving his car[], as well attend church and family gathering[s]." *Id.* ALJ Massengill then explained that "[s]ome of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment," and thus Lawrence's "ability to participate in such activities diminishe[d] the persuasiveness" of his allegations. *Id.*

Lawrence did identify limits on his ability to perform many of these activities. *See, e.g.,* R. 2090–91 (Lawrence's testimony that although he could handle his finances "when [he was] doing well," his wife usually handled them); R. 2104 (Lawrence's testimony that memory difficulties caused him to "leave[] stuff on the stove" and that his ability to clean was limited). ALJ Massengill considered many of Lawrence's reported limitations throughout his decision, and he explained his reasons for discounting them. For example, as to Lawrence's left shoulder

impairment, the ALJ observed that Lawrence "reported significant relief following his surgery, including being able to resume power lifting. While he testified [that] his left shoulder continued to produce symptoms, the evidence did not show imagining or significant exam findings during the relevant period to support his complaints." R. 2041. As to Lawrence's abilities to stand and walk, the ALJ noted, Lawrence "reported an inability to stand and walk for more than a short period of time. However, [he] regularly walked with a normal gait, could heel, toe and tandem walk and [] showed extremity strength and [intact] sensation." R. 2040; *see also* R. 2097 ("I usually can't stand or sit more than 15, 20 minutes. But if I keep moving and I get in different positions, I can . . . usually keep on going through most of the day."). Moreover, Lawrence often suggested he had greater functional abilities than the average non-disabled person, even during the relevant period. R. 2103 (Q: "And during that time, 2011 to 2013, were you able to do things around the house in terms of cleaning?" A: "Yes, ma'am. Most people probably wouldn't . . . we've got a lot of responsibility. We have a special needs daughter, and there's just a lot to be done."); R. 2097 (stating he sometimes could lift "about as much as two or three men" during the relevant period). The ALJ's discussion of the medical evidence and Lawrence's report of functional abilities and activities provide support for his assessment of the credibility of Lawrence's symptoms. Furthermore, ALJ Massengill could reasonably determine that these activities require the same functional capacities "necessary for obtaining and maintaining employment." R. 2041.

Based on the record as a whole, ALJ Massengill reasonably concluded that Lawrence's reported daily activities were inconsistent with his reported symptoms and limitations. ALJ Massengill did not doubt that Lawrence experienced pain. Nevertheless, he found that Lawrence's pain was not disabling, and he accounted for it by restricting Lawrence to

performing light work with at most frequent reaching overhead, among other limitations. Lawrence did "not have to be pain-free in order to be found 'not disabled,'" particularly considering ALJ Massengill found that he could work only "at a lower exertional level" than he did before his alleged disability onset date. *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1457–58 (4th Cir. 1990)), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011). ALJ Massengill's decision thoroughly documented the evidence and provided a reasonable explanation for his assessment of Lawrence's symptoms and limitations and his RFC determination. Accordingly, I find that the decision is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 21, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: January 31, 2022

Joel C. Hoppe
U.S. Magistrate Judge